UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SYLVESTER EVANS,

        Plaintiff,                         No. 2:10-CV-11275

v.                                        Hon. Gerald E. Rosen

WAYNE COUNTY, a Municipal
Corporation, WARREN EVANS,
former Wayne County Sheriff;
BENNY N. NAPOLEON, Successor
Wayne County Sheriff; and KEVIN SEMAK,
Commander and Disciplinary Officer,
in their official and individual capacities, jointly
and severally

        Defendants.

_____/

## OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DISMISSING PLAINTIFF'S COMPLAINT, IN ITS ENTIRETY

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on _____November 10, 2011_____

PRESENT:    Honorable Gerald E. Rosen
                Chief Judge, United States District Court

## I.   INTRODUCTION

This matter is presently before the Court on the Fed. R. Civ. P. 56 Motion for Summary

Judgment filed by Defendants Wayne County; former Wayne County Sheriff, Warren C. Evans;

Benny N. Napoleon, Evan's successor as County Sheriff; and Kevin Semak, a Commander in the

Sheriff's Department and the Department's Disciplinary Officer. Plaintiff Sylvester Evans has

responded and Defendants have replied. Having reviewed the parties' briefs and supporting

evidence, and the Court's entire record of this matter, the Court has determined that oral

argument is not necessary. Therefore, pursuant to Eastern District of Michigan Local Rule

7.1(f)(2), this matter will be decided on the briefs. This Opinion and Order sets forth the Court's

ruling.

## II.   FACTUAL BACKGROUND

Plaintiff Sylvester Evans, an African American male, was employed by Wayne County as a

Wayne County Deputy Sheriff from October 21, 1985 until he was terminated on January 14,

2008. At the time of his termination, Plaintiff was assigned to the center control station at

Wayne County Jail. (*See* Plaintiff's Dep., p. 13, Defendants' Ex. 1; *see also* Defendants' Ex.

9).[1]

Plaintiff's termination was based upon his having tested positive for marijuana during a

random urine drug test conducted by the Sheriff's Department on December 19, 2007. Aside

from this incident, Plaintiff maintains that he had a satisfactory work record during the 22-plus

years of his employment with Wayne County.[2] Plaintiff's employment relationship was

---

[1]  Plaintiff testified that he was assigned to the jail for approximately two months prior to his
termination. (Pl's Dep., p. 13) Before the jail assignment, from July through November 2007, he
was assigned to the Third Circuit Court lobby. *Id.* at 14-15. The five previous years – from
2002 through 2007, he worked patrol in Highland Park. *Id.* at 15. Prior to that time, he worked
for the immediately preceding four years at the airport (this was prior Warren Evans' coming on
board as County Sheriff). *Id.* at 16-18.

[2] Although Plaintiff claims to have maintained a satisfactory work record during the course of his
employment with Wayne County, the record provided the Court shows otherwise. The record
indicates that in just the 24 month period prior to having tested positive for drugs, Plaintiff was
found to have violated various other work rules for which he received discipline, up to and
including a suspension. (Ex. 9, pg. 15). On January 8, 2007, Plaintiff received a written
reprimand and on  January 16, 2007 he pled guilty to the following violations: 2.0 Violation of
Rules (GM 99-3 Zero Tolerance Incidents, # 8120 Firearms/Ammunition, GM 9904 Use of
Leave Time, # 9112 Sick Leave); and 5.110 Unsatisfactory Performances; 7.35 Weapons. (Def's
Ex. 31; Ex. 9, pg. 16). The record evidence also provides that on September 20, 2007, Plaintiff
received a two-day suspension, and on September 24, 2007, he pled guilty to the following

2

governed by a collective bargaining agreement ("CBA") between Wayne County and Local 502 of the Service Employees International Union, AFL-CIO, (the "Union").

Upon learning that Plaintiff tested positive for marijuana, Defendant Kevin Semak, Plaintiff's Commander and the Sheriff's Department Disciplinary Officer, summoned Plaintiff to appear for an internal affairs ("I.A.") interview.[3]  At the I.A. interview, Plaintiff was read his *Garrity*[4] rights and, on advice of his union representative, Plaintiff refused to answer any questions about drug use.  Following the interview, Plaintiff was given notice of the Department's charges against him along with notice of an Administrative Review and Determination ("A.R.D.") hearing regarding the charges, and was provided documents containing a copy of the formal charges, a witness list, drug screening lab results and the chain of custody record of his urine sample.

Plaintiff was charged with violating nine of the Sheriff Department's standards of conduct. (Def's Ex. 6; Def's Ex. 8).  Seven of the charges stem from Plaintiff having tested positive for drugs; these include: 2.0 Violation of Rules (GM 99-3 Zero Tolerance Incidents), 3.20 Drug Possession and Use, 5.10 Conduct, 5.25 Conformance to Laws, 5.40 Enforcement of Laws and Ordinances, 6.30 Personal Integrity, and 6.35 Personal Responsibilities.  (*Id*.; Ex. 20, pg. 53-60). The other two charges -- 5.110 Unsatisfactory Performances and 5.60 Insubordination/ obeying

---

violations: 2.0 Violation of Rules (GM 99-3 Zero Tolerance Incidents, #9112 Sick Leave); 4.35 Sick Leave/Attendance; and 5.110 Unsatisfactory Performance.  (Def's Ex. 32; Ex. 9, pg. 16).

[3]  An internal affairs investigation was initiated to determine the extent of Mr. Evans' involvement with illegal narcotics and whether he had compromised the safety and security of the Sheriff's Office by introducing illegal narcotics or contraband into the jail system.  *See* Def's Ex. 8.

[4] *Garrity v. State of New Jersey*, 385 U.S. 493, 87 S.Ct. 616 (1967).

3

Orders -- stem from Plaintiff's refusal to answer questions during his internal affairs interview after receiving his *Garrity* rights.  (Ex. 20, pg. 56-59).

At the A.R.D hearing conducted by Defendant Semak, Plaintiff, who was accompanied by Gregory Hattaway, his union vice-president, was given the opportunity to respond to the charges against him before discipline was imposed.  Plaintiff admitted to Defendant Semak during the hearing that he had used marijuana.  After the hearing concluded, Plaintiff was found guilty as charged and his employment terminated.

Plaintiff appealed his termination to the Wayne County Labor Board and a grievance was submitted for a hearing by a neutral arbitrator, George Roumell, Jr. (the "Arbitrator").  At the arbitration hearing, Plaintiff did not challenge his selection for testing and stipulated to the fact that he had tested positive through appropriate procedures for marijuana.  Plaintiff was given an opportunity to call witnesses, testify, and to present evidence, but relying on advice of his union representative, he declined to do so.  Arbitrator Roumell reviewed the charged offense in light of Plaintiff's work record, length of service, and other pertinent evidence that included discipline imposed on other officers with positive drug tests.  Arbitrator Roumell then concluded that Plaintiff's termination was supported by just cause, and subsequently, denied Plaintiff's grievance and sustained his termination.

Thereafter, Plaintiff filed this suit against Wayne County, Kevin Semak, former Wayne County Sheriff, Warren Evans, and Evans' successor, Benny Napoleon.  In his Complaint, Plaintiff asserts seven legal theories under federal and state law: violation of 42 U.S.C. § 1983 (Count I); violation of Elliot-Larsen Civil Rights Act (Count II); breach of duty under Art. 1, § 17 of State of Michigan Constitution to Conduct Fair and Just Investigation (Count III); violation of Plaintiff's liberty and property interests in violation of the 5th and 14th Amendments (Count

4

IV); abuse of discretion in discriminatory selective enforcement of Zero Tolerance Drug Policy (Count V); violation of 4th Amendment as a result of an unreasonable search (Count VI); and a claim in which Plaintiff alleges that the arbitrator ignored the contract's plain language and dispensed his own brand of justice (Count VII).

Defendants bring this motion for summary judgment pursuant to Fed. R. Civ. P. 56 arguing first that Plaintiff's claims are not actionable as they are not supported by evidence sufficient to create a genuine issue of material fact.  Specifically, Defendants contend first that Plaintiff's claims are barred from review because Plaintiff's union contract contained a grievance procedure with binding arbitration as the exclusive remedy.  In the event that Plaintiff's claims are not barred by the exclusive remedy provision in his contract, Defendants argue that Plaintiff's first two counts -- his Section 1983 and ELCRA claims (which are both evaluated under the *McDonald Douglas*[5] burden shifting framework applied in Title VII cases) -- should be dismissed on summary judgment because Plaintiff cannot prove the fourth element of his *prima facie* case nor can he show that the positive drug test in violation of Sheriff Department rules and policy was not the true reason for his termination.

With regard to Count III, Defendants contend that suits for damages based upon alleged violation of the Michigan Constitution cannot be brought against municipalities or individual government employees, and in any event, Plaintiff was afforded due process and fair treatment in accordance with the Due Process and Fair and Just Treatment Clauses of the Michigan Constitution.  As to Count IV, Defendants contend that Plaintiff was afforded all the process that was due him under the 14th Amendment of the United States Constitution and *Loudermill*[6] as he

---

[5] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817 (1972).

[6] *Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487 (1985).

received both a pretermination discipline review hearing and a post-termination arbitration hearing.

Defendants also contend that Count V, Plaintiff's "selective enforcement" claim, should be dismissed because Plaintiff cannot show both a discriminatory purpose and a discriminatory effect, as Defendants' actions were legitimately premised and not discriminatory. With regard to Count VI, Defendants contend that there could have been no Fourth Amendment violation where Plaintiff expressly agreed to undergo random drug testing as a condition to his employment. In addition, Plaintiff did not dispute the results of his drug test at his arbitration, and, in fact, stipulated that he tested positive through appropriate procedures. As to Plaintiff's final Count, Defendants contend that Plaintiff has no basis to set aside the arbitrator's award.

## III.   APPLICABLE STANDARDS

Summary judgment is proper if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). As the Supreme Court has explained, "the plain language of Rule 56[] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). In addition, where a moving party seeks an award of summary judgment in its favor on a claim or issue as to which it bears the burden of proof at trial, this party's "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799, F.3d 254, 259 (6th Cir. 1986) (internal quotation marks, citation, and emphasis omitted).

In deciding a motion brought under Rule 56, the Court must view the evidence in a light most favorable to the nonmoving party.  *Pack v. Damon Corp*., 434 F.3d 810, 813 (6th Cir. 2006). Yet, the nonmoving party may not rely on mere allegations or denials but must "cit[e] to particular parts of materials in the record" as establishing that one or more material facts are "genuinely disputed."  Fed. R. Civ. P. 56(c)(1).  Moreover, any supporting or opposing affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment."  *Pack*, 434 F.3d 814 (alteration, internal quotation marks, and citation omitted).

## IV.   DISCUSSION

### A.  QUALIFIED IMMUNITY

As an initial matter, the Court notes Defendants' qualified immunity arguments for Plaintiff's § 1983 claims against individual Defendants Evans, Napoleon and Semak.  However, because, as discussed below, the Court finds that dismissal on the merits of Plaintiff's Section 1983 claims is warranted, it is unnecessary for the Court to proceed with a qualified immunity analysis.[7]

---

[7] Qualified immunity shields government officials performing discretional functions when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."'  *Burchett v. Kiefer*, 310 F.3d 937, 942 (6th Cir. 2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982)).  A two-part test is used to analyze claims of qualified immunity: "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established."  *Estate of Carter v. City of Detroit*, 408 F.3d 305, 310-11 (6th Cir. 2005).

Where the defendant moves for dismissal on qualified immunity grounds early in proceedings, i.e., before discovery or before discovery is completed, a ruling on that issue should

B.  A GENERAL ARBITRATION CLAUSE IN A COLLECTIVE BARGAINING
    AGREEMENT IS NOT ENFORCEABLE TO BAR PLAINTIFF'S STATUTORY
    DISCRIMINATION CLAIMS FROM JUDICIAL REVIEW

Defendants first argue that most of Plaintiff's claims are barred from review because his

union contract contained a grievance procedure with binding arbitration as the exclusive remedy,

as well as provisions prohibiting wrongful discharge and unlawful discrimination. A collective

bargaining agreement arbitration clause, however, must meet certain requirements to be

enforceable to preclude an employee covered by such a clause from pursuing a statutory

discrimination action in a judicial forum.  *Wright v. Universal Maritime Services Corp.,* 525 U.S.

70, 79-80, 119 S. Ct. 391 (1998).  In *Wright*, the Supreme Court set forth a "clear and

unmistakable" standard to determine the enforceability of a collective bargaining agreement

arbitration clause in this regard.  *Id*.  The Court held that it "will not infer from a general

contractual provision that the parties intended to waive a statutorily protected right unless the

undertaking is 'explicitly stated.'"  *Id*.  "[T]he waiver must be clear and unmistakable."  *Id*.  In

applying this standard in *Bratten v. SSI Serv., Inc*., 185 F.3d 625 (6th Cir. 1999), the Sixth Circuit

held "that a statute must specifically be mentioned in a CBA for it to even approach *Wright's*

'clear and unmistakable' standard."  *Id*. at 631.  The *Bratten* court reasoned that merely

"including a provision in a collective bargaining agreement that prevents discrimination against

---

be made so that the costs and expenses of trial are avoided where the defense is dispositive.
*Saucier v. Katz*, 533 U.S. 194, 200-201 (2001). Qualified immunity is "an entitlement not to
stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).
The privilege is "an immunity from suit rather than a mere defense to liability; and like an
absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id*. Here,
Defendants did not raise the qualified immunity until after discovery was completed, and since,
as indicated, the Court deems dismissal warranted on the merits of Plaintiff's Section 1983
claims, it is unnecessary for the Court to conduct a qualified immunity analysis.

employees under a federal statute is not the same as requiring union members to arbitrate such statutory claims." *Id*. at 631-32 (internal quotations and emphasis omitted).

Applying the foregoing standards in *Bratten*, the court determined that the clause stating "[a]ny grievance arising under the terms of this contract or an alleged violation thereof shall be handled [pursuant to the grievance resolution procedure] in the following manner" was insufficient to divest the district court of jurisdiction over the plaintiff's ADA claim. *Id*. at 631-32. *See also Kenney v. Superior Printing Company,* 215 F.3d 650, 654 (6th Cir. 2000) (holding that "a general anti-discrimination provision that prohibits various forms of discrimination against employees, including discrimination based on disability, is insufficient to compel an employee to arbitrate his ADA claim); *Nance v. Goodyear Tire & Rubber Company*, 527 F.3d 539, 549 (6th Cir. 2008) (holding that "if a plaintiff does not expressly waive her right to bring claims in federal court, a prior arbitration does not preclude us from reconsidering all factual issues underlying a statutory claim"). In contrast, the Supreme Court in *14 Penn Plaza LLC v. Pyett*, 129 S. Ct. 1456, 1474 (2009) held that a CBA provision which specifically required union members to arbitrate ADEA and other statutory discrimination claims was enforceable as matter of federal law. *Id*.) The CBA provision in *Pyett* provided:

> §30 NO DISCRIMINATION. There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability, national origin, sex, union membership, or any other characteristic protected by law, including, but not limited to, claims made **pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the New York State Human Rights Law, the New York City Human Rights Code, … or any other similar laws, rules, or regulations.** All such claims shall be subject to the grievance and arbitration procedures (Articles V and VI) as the **sole and exclusive remedy** for violations. Arbitrators shall apply appropriate law in rendering decisions based upon claims of discrimination.

*Id*. at 1461(emphasis added)).

9

Applying these principles in the instant case, the Court concludes that the "clear and unmistakable" standard is not met.  The CBA in question contains a general anti-discrimination provision that prohibits various forms of discrimination against employees, including discrimination based on race.  Specifically, the anti-discrimination provision at issue provides that:

> The parties recognize that the Employer is legally and morally obligated to guarantee to all citizens a fair and equal opportunity for employment and to these ends agree that no person shall be denied employment, or membership in the Union, nor in any way be discriminated against or harassed because of sex, age, height, weight, race, color, creed, national origin, political or religious belief, marital status, or sexual orientation.

(Ex. 10, pg.1).

Other applicable provisions state:

> The parties agree that the provisions contained herein shall be subject to the grievance procedure as set forth in Article 8 (Settlement of Disputes) and Article 9 (Disciplinary Procedure) of this Collective Bargaining Agreement.

(Ex. 10, pg.1).

Article 8 provides:

> Whenever an employee believes that any provision of this Agreement has not been properly interpreted or applied, a grievance may be filed according to the following procedure contained in the Agreement.   This procedure shall be the exclusive grievance procedure for all members of the bargaining unit.
>
> ***
>
> D. There shall be no appeal from the decision of the Arbitrator if made in accordance with his or her jurisdiction and authority under this Agreement.
>
> E. An arbitration award shall be final and binding on the Employer, on all Bargaining Unit members, and upon the Union.   The Union shall discourage attempts by any Bargaining Unit member to appeal a decision of the Arbitrator to any Court or Labor Board.

(Ex. 11, Art. 8, § 8.01 & Step 5, §§ D & E).

10

Despite the fact that these provisions provide that the grievance procedures shall be the exclusive remedy for employees under this CBA, nowhere does the CBA reference 42 U.S.C. § 1983 or the Elliott-Larsen Civil Rights Act, nor does the CBA clearly state that any statutory discrimination claims are subject to arbitration. Since the discrimination statutes were not even mentioned in the CBA governing Plaintiff's employment, Plaintiff did not "clearly and unmistakably" waive his right to bring his statutory discrimination claims in a judicial forum.

C.    COUNTS I & II - RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1983 AND ELLIOTT-LARSEN CIVIL RIGHTS ACT

1.    Defendant Napoleon Had No Involvement in the Complained Actions

As an initial matter, the Court notes that Plaintiff has failed to present any evidence as to the involvement of Defendant Benny Napoleon in disciplining Plaintiff or in terminating his employment. It is well-settled that to state a cognizable Section 1983 claim, the plaintiff must establish some personal involvement by each of the named defendants. *See Salehpour v. Univ. of Tenn.*, 159 F.3d 199, 206 (6th Cir. 1998), *cert denied*, 526 U.S. 1115 (1999); *Bennett v. Schroeder*, 99 Fed. Appx. 707, 712 (6th Cir. 2004); *see also Copeland v. Machulis*, 57 F.3d 476, 481 (6th Cir. 1995) (personal involvement by the defendant is an essential element in a § 1983 cause of action asserting a constitutional deprivation). Even if the party is a supervisor, that person cannot be held liable under a traditional theory of *respondeat superior*; a plaintiff must demonstrate that the supervisor "directly participated in or encouraged the alleged deprivations." *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989).

In this case, Defendant Napoleon had nothing to do with Plaintiff's termination or the earlier discipline imposed on him. As indicated above, Plaintiff was disciplined in January and September 2007 for various rules violations. The random drug test which led to Plaintiff's termination occurred in December 2007. Plaintiff was fired in January 2008 and his arbitration

11

concerning his firing was completed in May 2008.  Napoleon did not become sheriff of Wayne

County until July 2009, more than a year after the events giving rise to this action.  Furthermore,

Plaintiff admitted in his deposition that the only reason he named Benny Napoleon as a

defendant in this action is because Napoleon was Warren Evans' successor.  (Ex. 1, pg. 149-50).

Under these circumstances, there is no basis for holding Defendant Napoleon liable for any of

the Plaintiff's Section 1983/constitutional claims.  The claims against Defendant Napoleon,

therefore, will be dismissed.

2.   Plaintiff Has Failed To Make Out a *Prima Facie* Case of Discrimination

Plaintiff has alleged claims of race discrimination under (1) 42 U.S.C. § 1983 under a theory

of violating the Equal Protection Clause of the Fourteenth Amendment, and (2) the Michigan

Elliott-Larsen Civil Rights Act.  It is well-established that the burden is on the employment

discrimination plaintiff -- under both federal and Michigan law -- to establish a *prima facie* case

of discrimination.  *See Lautermilch v. Findlay City Schools*, 314 F.3d 271, 275 (6th Cir. 2003);

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1972); *Texas*

*Department of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 1095 (1981);

*Carden v. General Motors*, 156 Mich. App. 202, 210 (1986), *lv.den*., 248 Mich. 891 (1987).[8]

Plaintiff can establish his unlawful discrimination under Michigan's Elliott-Larsen Civil Rights

Act ("ELCRA")[9] either (1) by producing direct evidence of discrimination or (2) by presenting a

---

[8] Race discrimination claims under §1983 are evaluated under the same standards as Title VII
and Elliott-Larsen claims.  *See Weberg v. Franks*, 229 F.3d 514, 522-23 (6th Cir. 2000);
*Sutherland v. Michigan Dept. of Treasury* 344 F.3d 603, 614 (6th Cir. 2003).

[9] The ELCRA provides, in pertinent part:

(1) An employer shall not do any of the following:

*prima facie* case of discrimination in accordance with the *McDonnell Douglas/Burdine*[10] framework established by the United States Supreme Court for use in Title VII cases. *Hazle v. Ford Motor Co.*, 464 Mich. 456, 462-62, 628 N.W.2d 515, 520-21 (2001). Plaintiff here contends that he can make out his claim under both theories.

*(a)*   *Plaintiff Has Failed to Produce Direct Evidence of Race Discrimination*

"Direct evidence" of discrimination is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Hazle v. Ford Motor Co.*, *supra*, 464 Mich. at 462, 638 N.W.2d at 520 (quoting *Jacklyn v. Schering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). Accordingly, "direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.* 319 F.3d 858, 865 (6th Cir. 2003). When a plaintiff can cite direct evidence of discrimination, the *McDonnell Douglas/Burdine* shifting burdens of proof are not applicable. *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 622 (1985); *DeBrow v. Century 21 Great Lakes, Inc.*, 463 Mich. 534, 539, 620 N.W.2d 836, 838 (2001). The presentation of direct evidence is generally sufficient to submit the plaintiff's case to the jury. *Harrison v. Olde Financial Corp*, 225 Mich.App. 601, 610, 572 N.W.2d 679 (1997).

---

(a) Fail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of religion, race, color, national origin, age, sex, height, weight, or marital status.

M.C.L. § 37.2201(1)(a).

[10] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1972); *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089 (1981).

Plaintiff proffers as his "direct" evidence of discrimination the comparative numbers of black and white officers (1) whose termination grievances were resolved at the arbitration stage; (2) who were first time marijuana use offenders whose cases were resolved at the arbitration stage; and (3) first time marijuana use offenders who were terminated.  However, this evidence does not constitute "direct evidence" of race discrimination because it requires the factfinder to draw an inference that disparity between the numbers of black and white officers who were and were not terminated is the result of racial prejudice.  "Such statistical evidence at most may constitute circumstantial evidence of discrimination."  *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006) (holding that evidence of the racial composition of the college showing few minority hirings faculty "does not lead ineluctably to the conclusion that the college considered race when eliminating the plaintiff from consideration for the position for which he applied").[11]

*(b)*   *Plaintiff's Claims of Race Discrimination Under the McDonnell Douglas Framework*

To establish an ELCRA discrimination claim using the *McDonnell Douglas* framework, a plaintiff is required to present evidence showing that he was (1) a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position, and (4) others, similarly-situated and outside the protected class, were treated differently.  *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 695, 568 N.W.2d 63, 68 (1997).  If plaintiff successfully proves a *prima facie* case, the burden of production shifts to the employer to

---

[11] In *Amini*, plaintiff, an applicant for a college faculty position, sued the college for race, religion, national origin, and age discrimination under Title VII, ADEA and 42 U.S.C. §1981. *Amini*, 440 F.3d at 359.  The plaintiff pointed to the facts that the college never hired an African-American or Middle-Eastern faculty member, that the chair of the search committee did not recall reviewing an application from any candidate other than a non-European White, and that the college only hired a non-white faculty member after the plaintiff filed his complaint with the EEOC.  *Id*. at 358-59.  The court held that this evidence does not amount to direct evidence of discrimination.  *Id*. at 359.

articulate some legitimate, nondiscriminatory reason for the employment decision.  *Hazle*, *supra*;

*Lytle v. Malady* (On Rehearing), 458 Mich. 153, 172-73, 579 N.W.2d 906, 913 (1998);

*McDonnell Douglas*, *supra*; *Burdine*, *supra*.  Once the employer carries this burden, the burden

of production shifts back to the plaintiff to show, by a preponderance of the evidence, that the

legitimate reasons offered by the employer were not its true reasons, but rather were a pretext for

unlawful discrimination.  *Hazle*, *supra* at 456-66; *Town*, *supra*, at 698; *Lytle*, *supra*, at 175-76.

In the present case, Defendants first argue that Plaintiff cannot prove his *prima facie* case

because Plaintiff cannot show that he was treated differently than similarly-situated white

officers.

> [T]o be deemed "similarly situated" in the disciplinary context, "the individuals
> with whom the plaintiff seeks to compare his/her treatment must have dealt with
> the same supervisor, have been subject to the same standards and have engaged in
> the same conduct without such differentiating or mitigating circumstances that
> would distinguish their conduct or the employer's treatment of them for it."

*Russell v. University of Toledo,* 537 F.3d 596, 607 (6th Cir. 2008) (quoting *Mitchell v. Toledo*

*Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)).  Plaintiff compares himself to other officers who

tested positive for drugs.

The record indicates that 19 officers tested positive for drugs, 13 of whom are African-

American and six are white.  (Ex. 14)[12].  According to Plaintiff, three of the six white officers

were not terminated after their first positive drug test but instead were permitted to remain on the

---

[12] In his response brief, Plaintiff focuses the comparison of his treatment to the treatment of
officers who were first-time marijuana offenders.  (Plaintiffs Reply Brief, pg. 15-16).  Therefore,
he compares himself to 13 officers who were first-time marijuana offenders, as opposed to all 19
officers identified in the record evidence who tested positive for drugs of all kinds.  However, it
matters not whether the Court uses only Plaintiff's 13 marijuana users or the larger "drug user"
group (which includes, of course, the 13 marijuana users) as Defendants suggest because, as
discussed *infra*, none of the identified employees are "similarly situated, non-protected class
members," as defined under Sixth Circuit law.

job subject to "last chance agreements." (Ex. 1, pgs. 137-139). The white officers who Plaintiff

claims received last chance agreements are David Closser, Randall Daley and Donald Walls.

The record evidence however, shows that David Closser did not remain on the job subject to a

last chance agreement after he tested positive for drug use; rather he immediately elected to

voluntarily resign. (Ex. 34). Plaintiff did not offer to voluntarily resign , and in fact, repeatedly

demanded reinstatement. Therefore, he is not similarly-situated to Closser.

     With regard to Randall Daley, Daley first tested positive for drugs in 1999 and was

permitted to remain as a law enforcement employee of the Department. He subsequently tested

positive for drugs again, in March 2007, which resulted in his termination. (Ex. 37, pgs. 8, 12).

However, Defendants have presented evidence showing that Daley's first positive drug test and

last chance agreement, which Plaintiff relies upon as evidence of discriminatory treatment,

occurred during, or before, 1999, which predates the standards of conduct under which Plaintiff

was charged and also predates both Warren Evans' and Benny Napoleon's tenure as County

Sheriff, and Defendant Semak's tenure as Commander of Police Discipline. (Exhibits 21, 22,

24).[13] Consequently, Plaintiff is not similarly-situated to Daley because the rules that governed

Daley's employment were different from those that governed Plaintiff's. In addition, Daley dealt

with a different disciplinary officer and a different sheriff than Plaintiff.

     Lastly, although Donald Walls was allowed to remain on the job subject to a last chance

agreement, he entered into that last chance agreement in 1995, which not only predates the

standards of conduct under which Plaintiff was charged and the time the individual Defendants

---

[13] The Standards of Conduct under which Plaintiff was charged did not go into effect until July 9, 2003. (Ex. 22, pg. 1). Defendant Semak became the Commander of Police Discipline in December 2006. (Ex. 21). Warren Evans did not become the Wayne County Sheriff until January 1, 2003; he remained in that position until July 6, 2009. (Ex. 24, ¶¶ 4, 5). Defendant Benny Napoleon became Sheriff on July 27, 2009; he currently holds that position. *Id.*

16

served in their respective supervisory positions, it also predates General Memo 99-3 setting forth the Department's "zero tolerance" policy, which became effective as of August 25, 1999. (Exhibits 18, 19).  In addition, Walls worked for the airport police department at the time of his last chance agreement.  Accordingly, Plaintiff -- who was working at the county jail under different supervisors and different work rules -- was not similarly-situated to Walls.  (Ex. 18).

Three additional white officers who tested positive did not receive last chance agreements. (Ex. 14).  Like Plaintiff, Brian Keating was terminated and his termination was sustained by Arbitrator Deborah Brodsky.  (Ex. 14; Ex. 37 pg. 11).  Michael Donikian was notified that he tested positive on August 6, 2008; however, he was eligible for retirement and elected to retire on that same day without going through any formal disciplinary/grievance procedures.   (Exhibits 14 & 35).  Lastly, Thomas Browne was terminated and his arbitration is currently pending. (Exhibits 14 & 30).   Therefore, Plaintiff (1) was treated exactly like Brian Keating; (2) was not similarly-situated to Michael Donikian because Plaintiff was not eligible for immediate retirement;[14] and (3) does not know how he was treated compared to Thomas Browne because Thomas Browne's arbitration is still pending.  Accordingly, Plaintiff cannot prove his *prima facie* case of race discrimination because he failed to show that he was treated differently than similarly-situated white officers.

---

[14] Under Retirement Plan #4, in which Plaintiff was enrolled, an employee was entitled to retire at age 55 with 25 years of credited service.  (Ex. 29, ¶37.05, §E).  Plaintiff at the time of his termination was 54 years old and had only 22 years and three months of credited service.  (Ex. 1, pg. 179).  Although Plaintiff contends that he could have purchased his military time to be eligible for retirement at the time of his termination, he admits that he never took any action to do so.  *Id*. at 179-181.  In fact, when questioned, Plaintiff was not even sure how much the requisite military time would have cost him or whether he could have afforded it.  *Id*. In addition, the Arbitrator, after listening to the arguments, was not convinced that Plaintiff was close enough in terms of time of service to buy sufficient time to be eligible for retirement.  (Ex. 9, pg. 18).

Defendants further argue that, even if Plaintiff can prove his *prima facie* case, they had a legitimate, nondiscriminatory reason -- a positive drug test in violation of Sheriff rules and policy -- for Plaintiff's termination.  The Wayne County Sheriff's Department has standards of conduct that describe drug usage as well as a zero tolerance drug use and possession policy.  (Ex. 19, Ex. 20, pg. 19).  Consequences of violating the county drug policies are set forth in Section 43.04 of the CBA which provides:

> Disciplinary action will be initiated against any employee found to be in violation of this drug policy.  The severity of the action chosen will depend on the specific offense, the employee's work record, length of service and any available pertinent evidence.

> The Disciplinary action imposed shall be in accord with Article 9 of this agreement.  In general, where use, possession, sale or distribution of certain drugs would be a basis for a felony charge, the employee will be discharged.  If the drug(s) involved could result in a misdemeanor charge, discipline less than discharge may be imposed for the first offense.  If discipline less than discharge is imposed, mandatory periodic retesting will also be required.

(Ex. 13, pg. 130).

Section 43.04, therefore, makes clear that while lesser discipline is an option, discharge *may* nonetheless be imposed for the first offense.  Accordingly, Plaintiff's violation of said policy is a legitimate, nondiscriminatory reason for termination.

Because Defendants have articulated a non-discriminatory reason for terminating Plaintiff's employment, the burden of production shifts back to the Plaintiff to show by a preponderance of the evidence that the reason offered by the Defendants was not their true reason, but rather was a pretext for unlawful discrimination.  *Hazle*, *supra* at 465-66; *Town*, *supra*, at 698; *Lytle*, *supra*, at 175-76; *Burdine*, *supra*, 450 U.S. at 253, 101 S. Ct. at 1093.  Plaintiff has not met this burden.

Under federal law, a plaintiff can show pretext in three ways: "(1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's

18

action, or (3) that they were insufficient to motivate the employer's action." *Chen v. Dow Chemical Co*., 580 F.3d 394, 400 (6th Cir. 2009); *See also Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994); *Gray v. Toshiba Am. Consumer Prod*., 263 F.3d 595, 600-02 (6th Cir. 2001).[15]

Here, Plaintiff cannot show that his positive drug test had no basis in fact because he himself admitted that he tested positive through appropriate procedures. (Ex. 3; Ex. 1, pg. 73; Ex. 20, pg. 23).  In addition, Plaintiff failed to challenge the test result and, in fact, admitted to Defendant Semak that he had used marijuana. *Id*.  Nor can Plaintiff show that his positive drug test was insufficient to motivate Defendants' action, as testing positive for marijuana is a violation of Sheriff rules and policy.  Such a violation, even if it is a first offense misdemeanor charge, may result in discharge under the Sheriff rules and policy. (Ex. 13, pg. 130).

That leaves only the second pretext option -- that the employer's articulated reason did not actually motivate the discharge.  As to that type of rebuttal, the Sixth Circuit has held:

---

[15] Michigan law regarding pretext differs from federal law.  In *Lytle v. Malady, supra,* the Michigan Supreme Court affirmed its adoption of what is termed the "intermediate" position in determining whether a plaintiff's showing of pretext is sufficient to survive a motion for summary judgment:

> Under this [intermediate] position, disproof of an employer's articulated reason for an adverse employment decision defeats summary disposition only if such disproof also arises a triable issue that discriminatory animus was a motivating factor underlying the employer's adverse action.  In other words, plaintiff must not merely raise a triable issue that the employer's proffered reason was pretextual, but that it was a pretext for … discrimination.  Therefore, we find that, in the context of summary disposition, a plaintiff must prove discrimination with admissible evidence, either direct or circumstantial, sufficient to permit a reasonable trier of fact to conclude that discrimination was a motivating factor for the adverse action taken by the employer toward the plaintiff.

*Lytle*, 579, N.W. 2d at 916 (footnotes omitted); *see also Town v. Michigan Bell Telephone Co*., 455 Mich. 688, 568 N.W.2d 65, 68-69 (1997).  This "pretext plus" standard, then, is more demanding than the federal standard.

19

> If the bare bones elements of plaintiff's prima facie case were sufficient to make this showing, … the entire "burden shifting" analysis of *McDonnell Douglas* and its successors would be illusory. … Accordingly, we hold that, in order to make this type of rebuttal showing, the plaintiff may not rely simply upon his prima facie evidence, but must, instead, introduce additional evidence of [prohibited] discrimination.

*Manzer* at 1084.

Plaintiff here relies on his *prima* facie evidence of what he perceived as disparate treatment of other officers who tested positive for marijuana. However, as discussed earlier, Plaintiff has not shown that there are truly similarly-situated white officers who tested positive for marijuana that received a more favorable treatment. In fact, the only similarly-situated officer who tested positive for marijuana was Herbert Bostic, a black officer, who received a 90-day suspension without pay. (Exh. 16).

Evidence shows that the only officers that dealt with the same undersheriff as the Plaintiff who were first-time drug use offenders who tested positive for marijuana were Gregory Sturkey, Sharon McLemore, Herbert Bostic, David Closser and Michael Donikian. (Ex. 1, pg. 127; Ex. 9, pgs. 14 & 15). As indicated, Officer Donikian was retirement-eligible when he tested positive and elected to retire immediately, and officer Closser immediately voluntarily resigned. Officers Sturkey and McLemore were reinstated by arbitration awards. *Id.* An examination of their arbitration awards establishes that there were such "differentiating or mitigating circumstances that distinguish" McLemore's and Sturkey's treatment from the treatment of Plaintiff so as to render a comparison of these officers to Plaintiff legally insufficient. *See Russell v. University of Toledo, supra.*

With regard to Officer McLemore, though the Arbitrator acknowledged that Section 43.04 of CBA permitted the termination of a first-time offender of the drug policy, he determined that McLemore should not be terminated because (1) her marijuana use occurred while she was on an

20

extended medical leave, not while she was on the job; (2) the drug use was not discovered during

a random drug test but rather during a physical done prior to her return to work following her

medical leave; (3) she had no disciplinary action whatsoever taken against her during the 24

months preceding the drug test; (4) she voluntarily had gone to drug counseling; and (5) the EAP

counselor provided sworn evidence documenting that she was not a frequent or even an

infrequent drug user; that the marijuana use giving rise to the positive drug test was an "isolated

incident," an "aberration."  *See* Def's Ex. 43.

With regard to Officer Sturkey, the Arbitrator took note of Sturkey's length of service with

the Sheriff's Department – 35 years on the job – and the fact that his only prior discipline

throughout his entire 35 year tenure and during the 24 months preceding his positive drug test

was for attendance violations.  *See* Ex. 45.

Plaintiff, by contrast, had only 22 years of service, admitted more than an isolated one-time

marijuana use, was disciplined for sick leave and firearms violations during the 12 months

preceding his random drug test, and did not, at anytime, take advantage of drug counseling.  *See*

Ex. 9.

Because of the differentiating  and  mitigating factors presented in McLemore's and

Sturkey's cases, Plaintiff cannot make out a legally sufficient comparison of their treatment to

the treatment afforded him under Sixth Circuit law.

That leaves only officer Bostic.  Because Bostic, like Plaintiff is black, and hence not a

"non-protected class member," a comparison of his treatment to Plaintiff's cannot establish race

discrimination.

Plaintiff offers no other evidence of race discrimination.  In fact, when asked whether

Defendant Semak -- the decision-maker who decided what charges were to be brought for drug

21

violations – treated him as he did because of his race, Plaintiff stated that he did not view Semak as a racist: "I'm reluctant to say that about Commander Semak … because I'm familiar with Commander Semak and in that regard, I just never viewed him to be a person that would support this kind of thing."  (Ex. 1, pg. 81; Ex. 20, pg. 53-54).  Under these circumstances, Plaintiff has failed to establish that Defendants' stated reason -- Plaintiff's testing positive for marijuana -- was a pretext for race discrimination.

For the foregoing reasons, the Court will grant Defendants' motion for summary judgment on Plaintiff's claims of race discrimination in Counts I and II of the Second Amended Complaint.

**D.   COUNT III – BREACH OF DUTY UNDER ART. 1, §17 OF STATE OF MICHIGAN <u>CONSTITUTION TO CONDUCT FAIR AND JUST INVESTIGATION</u>**

In Count III, Plaintiff claims that the Defendants violated his right to a fair and just treatment as guaranteed in Article 1, section 17 of the Michigan Constitution[16] by failing to (1) preserve Plaintiff's urine sample for a retest by an independent lab of Plaintiff's choice; (2) make a transcript of the department hearing and the arbitration for purposes of review; and (3) give Plaintiff sufficient notice to prepare an adequate defense.

However, under Michigan law, it is settled that although a damages remedy for violation of the Michigan Constitution may be inferred against the State, or State officials sued in their

---

[16] Article 1, section 17 of the Michigan Constitution provides:

> No person shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law. The right of all individuals, firms, corporations and voluntary associations to fair and just treatment in the course of legislative and executive investigations and hearings shall not be infringed.

Const. 1963, Art. 1, § 17.

official capacity, *see Smith v. Dep't of Public Health*, 428 Mich. 540, 410 N.W.2d 749 (1987), *aff'd sub nom Will v. Dep't of State Police*, 491 U.S. 58 (1989), no such remedy exists for violation of the Michigan Constitution in an action against a municipality or a government employee sued in his individual capacity. *Jones v. Powell*, 462 Mich. 329, 612 N.W.2d 423 (2000). The *Jones* court explained that a narrow remedy against the State was recognized in *Smith* because of the unavailability of any other remedy. *Id*., 612 N.W.2d at 427. The court reasoned that those concerns, however, are inapplicable in actions against a municipality or an individual defendant because unlike states and state officials sued in an official capacity, municipalities are not protected by the Eleventh Amendment, *id.* (citing *Lake County Estates, Inc. v . Tahoe Regional Planning Agency*, 440 U.S. 391, 400-101, 99 S.Ct. 1171 (1979)), and an aggrieved plaintiff may sue a municipality in federal or state court under 42 U.S.C, § 1983 pursuant to *Monell v. New York City Dep't of Social Services*. 436 U.S. 658 (1978), and may sue individual defendants under § 1983 and under common-law tort theories.

Plaintiff contends that because he is suing a *county*, *Jones* is inapplicable. Plaintiff is mistaken. Counties are not state agencies, but rather they are local government units and, like municipalities, they are "among those persons to whom § 1983 applies." *Monell, supra*, 436 U.S. at 690. "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* Because another avenue of relief is available to obtain damages from the county and its officials, under *Jones*, Plaintiff's state constitutional claims are barred. *See HRSS, Inc. v. Wayne County Treasurer*, 279 F. Supp. 2d 846, 851 (E.D. Mich. 2003); *Curry v. Wayne County*, 2001 WL 765901 (Mich. App. 2001) (affirming summary

23

disposition of the plaintiff's constitutional claims against the county and its sheriff under *Jones*);

*Patriot Ambulance Service, Inc. v. Genesee County*, 666 F. Supp. 2d 712, 717 (E.D. Mich. 2009)

(dismissing plaintiff's claims for damages against the county, its board of commissioners and

individual commissioners for violation of the state constitution pursuant to *Jones*).[17]   Count III of

Plaintiff's Second Amended Complaint, therefore, will be dismissed.

E.   COUNT IV – VIOLATION OF PLAINTIFF'S LIBERTY AND PROPERTY INTEREST
     IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS

In Count IV, Plaintiff contends that he had a constitutionally protected property interest in

continued employment with Defendant Wayne County stemming from his employment contract

and long tenure with the Defendant Wayne County.  Plaintiff also contends that he had a liberty

interest in his good name and reputation, which was protected from infringement in the course of

an adverse personnel action.  Plaintiff claims that his liberty and property interests were violated

when he was terminated without due process.

Defendant argues that Plaintiff received all the process that was due him because he

received both a pre- and a post-termination hearing.  An individual must receive notice and an

opportunity to respond before he or she can be deprived of life, liberty, or property.  *Cleveland*

*Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493 (1985).  A pretermination

proceeding is required for public employees who can only be fired for cause.  *Farhat v. Jopke*,

970 F.3d 580, 595 (6th Cir. 2004).  This pretermination proceeding is constitutionally sufficient

---

[17] In *Patriot Ambulance Service*, the court noted that the plaintiff did not only ask for money
damages for his state constitutional claims but also asked for declaratory judgment on these
claims.  666 F. Supp. 2d at 717.  Therefore, to the extent that the  plaintiff was not seeking
monetary relief, the court allowed the plaintiff to go forward with his state claims.  *Id.*  Plaintiff
here, however, did not seek declaratory or injunctive relief in his Second Amended Complaint
with respect to his state constitutional claim nor did he make any argument for such relief in his
Response to Defendants' Motion for Summary Judgment.

so long as the employee "[is] given 'oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer.'" *Id*. (quoting *Buckner v. City of Highland Park*, 901 F.2d 491, 494 (6th Cir. 1990)). The pretermination proceeding does not require a neutral and impartial decision maker; rather, the employee may respond to the official responsible for the discharge. *Id*.

A post-termination hearing is also required. This hearing requires a neutral decisionmaker, reasonable procedural requirements, and notice to, and an opportunity for, the employee to participate meaningfully. *Id*. The Sixth Circuit has held that "[w]here there is a system of post-termination procedures available to the employee that includes a neutral decisionmaker and/or arbitration, coupled with a pretermination 'right of reply' hearing, then the employee has received all the process due under the constitution." *Id*. In addition, "'grievance procedures provided by a collective bargaining agreement can satisfy a plaintiff's entitlement to post-deprivation due process.'" *Id*. (quoting *Hennigh v. City of Shawnee*, 155 F.3d 1249, 1256 (10th Cir. 1998)).

The disciplinary procedures in the current case were governed by Article 9 of the CBA, which contains both the police officer's bill of rights and procedures for administrative review and determination ("A.R.D.") hearings. Plaintiff received (1) a pre-termination A.R.D. hearing, where he was given an opportunity to respond to the charges against him; and (2) a hearing by a neutral arbitrator, where he could challenge his selection and procedures for his drug test, call witnesses, testify, and present evidence. Thus, Plaintiff received all process that was due him under the United States Constitution.

25

F.   COUNT V – ABUSE OF DISCRETION IN DISCRIMINATORY SELECTIVE
     ENFORCEMENT OF ZERO TOLERANCE DRUG POLICY

In Count V, Plaintiff asserts a claim of "Abuse of Discretion in Discriminatory Selective

Enforcement and Zero Tolerance Drug Policy" in which he presents additional due process and

equal protection arguments.  Specifically, Plaintiff contends that (1) Defendants administered its

zero tolerance policy regarding marijuana in an arbitrary, capricious and discriminatory manner;

(2) disciplinary measures taken against him were more harsh than those enforced against other

employees; (3) the administrative review and determination hearing procedures of the CBA are

unconstitutional on their face because no transcript is made of the proceedings, no written

findings of fact are made, no indication of the standards used, nor is there any indication that the

proceedings meet minimal procedural due process standards; (4) the pre- and post- termination

hearings conducted by Defendants were insufficient to satisfy the due process requirements; (5)

the command officers hearing Plaintiff's case at the pre-termination stage were not impartial

decision makers; and (6) Plaintiff was entitled to a formal pre-termination hearing because he

faced charges of drug abuse.[18]

Plaintiff claims he was the victim of "selective enforcement" of the drug policy.  Selective

enforcement can lead to liability under 42 U.S.C. § 1983 "if the plaintiff pleads 'purposeful

discrimination.'" *Gardenhire v. Schubert*, 208 F.3d 303, 319 (6th Cir. 2000).  "Discrimination is

'purposeful' if it is intended to accomplish some 'forbidden aim[,]' … includ[ing] intentional

---

[18]   With respect to arguments three through six, as already discussed above, Plaintiff was
afforded all the process that was due him.  There is no requirement that a pre-termination hearing
be transcribed, that findings of fact be made in writing, that the hearing be formal, or that the
hearing be before a neutral and impartial decision maker.  To the contrary, as set forth above, an
employee -- in a pretermination hearing -- is entitled to *oral* or written charges against him, an
explanation of employer's evidence, and an opportunity to respond.  And again, this hearing may
be before the official responsible for the discharge.  *Id.*

selective enforcement because of race, nationality, religion, gender or 'other arbitrary

classification." *Id.* The Sixth Circuit "has established a three-part test for determining if

selective enforcement has occurred:

> First, [an official] must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations. Second, [the official] must initiate the prosecution with a discriminatory purpose. Finally, the prosecution must have a discriminatory effect on the group which the defendant belongs to.

*Id.*

At issue in this case, is whether the charges brought against Plaintiff were initiated with a

discriminatory purpose and resulted in a discriminatory effect on the group to which the Plaintiff

belongs.

Plaintiff cannot prove discriminatory purpose because, as already discussed at length,

Plaintiff has not shown that race played a role in the charges or his termination. Plaintiff's

arguments and statistics are inapposite because he, again, compares himself to officers who are

not similarly-situated to him. Plaintiff's positive drug test -- which Plaintiff could not rebut as a

legitimate nondiscriminatory reason – gave rise to the charges. *Id.* at 18-19. Therefore,

Plaintiff's selective enforcement claim will be dismissed pursuant to Fed. R. Civ. P. 56.

G. COUNT VI – VIOLATION OF FOURTH AMENDMENT AS AN UNREASONABLE
   SEARCH

Plaintiff admits in his Response to Defendants' motion for summary judgment that this

count is within the scope of his CBA and, therefore, barred from this Court's review. (Plaintiff's

Response, ¶¶ 2 & 7). Accordingly, the Court dismisses Count VI.

## H.   COUNT VII – THE ARBITRATOR IGNORED THE CONTRACT'S PLAIN LANGUAGE AND DISPENSED HIS OWN BRAND OF JUSTICE

Lastly, Plaintiff contends that the arbitrator ignored the contract's plain language and dispensed his own brand of justice by (1) not making any finding that the drug test was properly administered; (2) not being properly instructed as to the parameters of his authority; (3) ignoring the Plaintiff's federally protected rights; and (4) making a ruling in which he dispensed his own brand of justice, by relying upon some of his prior rulings as binding precedents.

Defendants argue that the Arbitrator did not have to make findings regarding whether the test was properly administered because Plaintiff did not challenge the testing procedures or results; in fact, he had stipulated to these things.  The arbitrator could not have ignored Plaintiff's federally protected rights because Plaintiff, himself, admitted in his deposition that he never raised any concerns regarding disparate treatment based on race in the arbitration.  (Ex. 1, pg. 82).  Finally, the Arbitrator used his own prior rulings not as binding authority, but instead, as an explanation of how he interpreted and applied the contract.

The Court first points out that Plaintiff's claims in Count VII are all alleged against the "*Arbitrator.*"  The Arbitrator, George Roumell, Jr., is not named as a defendant, nor has he ever appeared in any capacity in this action.  Furthermore, Mr. Roumell did not serve as an agent of the county; rather he was selected pursuant to the CBA to serve as a neutral arbitrator by the parties to the contract.  Therefore, there is no basis for Plaintiff to seek relief from Defendants for this claim.

In any event, great deference is afforded to an arbitrator's decision interpreting a collective bargaining agreement, limiting review to ascertain whether the arbitrator erred.  *Equitable Resources, Inc. v. United States, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Wkrs. Int'l Union, AFL-CIO*, 621 F.3d 538, 545 (6th Cir. 2010).  This highly deferential

28

standard of *Michigan Family Resources*[19] is applied and upheld so long as the arbitrator's decision was "'arguably construing or applying the contract' and was not disqualified by fraud or a conflict of interest." *Id.* The arbitrator's decision must be affirmed "even if we believe that 'the arbitrator made 'serious,' 'improvident' or 'silly' errors in resolving the merits of the dispute,' leaving "'only the most egregious [arbitral] awards'" to be vacated. *Id.* (internal quotations omitted).

The scope of review is, therefore, limited to the following three questions:

[1] Did the arbitrator act "outside his authority" by resolving a dispute not committed to arbitration?

[2] Did the arbitrator commit fraud, have a conflict of interest or otherwise act dishonestly in issuing the award?

[3] And in resolving any legal or factual disputes in the case, was the arbitrator "arguably construing or applying the contract"?

*Id.*

In applying this standard of review, the Court finds nothing in the record to suggest that the Arbitrator acted outside his authority by resolving this dispute as Plaintiff appealed his termination and a grievance was submitted for a hearing before the Arbitrator. There is no evidence that the Arbitrator committed any fraud, had a conflict of interest or otherwise acted dishonestly in issuing this award. Lastly, it is clear that the Arbitrator construed and applied the contract. (*See* Arbitration Opinion and Award Ex. 9, pgs. 8-19). Count VII, therefore, will be dismissed.

---

[19] *Michigan Family Resources, Inc. v. Service Employees Intern. Union Local 517M*, 475 F.3d 746 (6th Cir. 2007).

<u>CONCLUSION</u>

In sum, the Court finds that Plaintiff has failed to state any claim upon which relief may be granted.  Therefore,

For all the reasons stated above in this Opinion and Order,

IT IS HEREBY ORDERED that the Defendant's Motion for Summary Judgment [Dkt # 27] is GRANTED and this case, therefore, is DISMISSED, in its entirety, with prejudice.


Dated:  November 10, 2011               s/Gerald E. Rossen_____
                                        Gerald E. Rosen
                                        Chief Judge, United States District Court

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 10, 2011, by electronic and/or ordinary mail.


                        s/Ruth A. Gunther_____

                        Case Manager